IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SUN RIVER ENERGY, INC.,           §
                                  §
            Plaintiff,            §
                                  §   Civil Action No. 3:13-CV-2456-D
VS.                               §
                                  §
HARRY NEAL McMILLAN, et al.,      §
                                  §
            Defendants.           §

MEMORANDUM OPINION
AND ORDER

The instant cross-motions for summary judgment present questions concerning plaintiff's claims to recover short-swing profits under § 16(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78p(b).  The court must also decide whether defendants are relying on unpleaded, waived affirmative defenses, and, if so, whether to modify the scheduling order to enable defendants to plead these affirmative defenses.  For the reasons that follow, the court denies defendants' motion to amend the scheduling order and for leave to file an amended answer, and it grants in part and denies in part the parties' motions for summary judgment.

I

Plaintiff Sun River Energy, Inc. ("Sun River") brings this action against defendants Harry Neal McMillan ("McMillan"), Cicerone Corporate Development, LLC ("Cicerone"), and CE McMillan Family Trust ("the Trust"), alleging that defendants are liable under § 16(b) of the Exchange Act for short-swing profits derived from the purchase and sale of Sun River common stock.  McMillan co-founded Cicerone and served as its sole member and

manager from approximately April 1, 2011 to May 2, 2011.[1]  In May 2011 McMillan transferred his interest in Cicerone to the Trust, for which he served as the sole trustee. Consequently, whether as Cicerone's sole member and manager, or as the Trust's trustee, McMillan had sole control or shared control over Cicerone and the Trust at all relevant times.

Sun River is a publicly-traded corporation whose stock is registered under § 12 of the Exchange Act, 15 U.S.C. § 78*l*, and listed for trading on the Over-the-Counter Bulletin Board.[2]  As of August 2010, before executing the transactions at issue in this dispute, Robert Doak ("Doak") directly or indirectly owned 6,117,233 shares of Sun River's stock, which comprised about one-quarter of Sun River's outstanding shares.  Doak owned approximately one-half of these shares directly and owned the other one-half indirectly through his ownership of New Mexico Energy, LLC ("NME").

In 2009 Sun River and Cicerone entered into a consulting agreement under which Sun River agreed to periodically issue common stock and stock warrants to Cicerone in exchange for consulting services.  Between September 2010 and February 2011, Sun River issued 100,000 shares and 120,000 stock warrants to Cicerone under this agreement.

---

[1]Because both sides move for summary judgment, the court will recount the evidence that is undisputed, and, when necessary to set out evidence that is contested, will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence.  *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. Oct. 25, 2010) (Fitzwater, C.J.) (citing *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

[2]The Over-the-Counter Bulletin Board "is a quotation service operated by the Financial Industry Regulatory Authority, Inc."  *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F.Supp.2d 478, 485 (S.D.N.Y. 2011).

In August 2010 Cicerone acquired two option contracts that permitted it to purchase the Sun River shares held by Doak and NME.  One option contract permitted Cicerone to purchase all 3,175,567 shares owned directly by Doak, and the other permitted Cicerone to purchase all 2,941,666 shares owned by NME for the exercise price of $1.50 per share on or before August 4, 2012.  After acquiring these options, Cicerone held more than 10% of the outstanding shares of Sun River common stock.  Just over one month later, Cicerone and Doak agreed to amend the terms of the second option to extend the exercise date from August 4 to September 12, 2012, and to change the exercise price from $1.50 per share to a price equal to $1.00 per share for the first 1,000,000 shares, $2.00 per share for the second 1,000,000, and $1.50 per share for the remaining 941,666 shares.

On August 6, 2010 Cicerone and Sun River entered into an agreement under which Cicerone agreed to cancel $468,541.48 of principal and accrued interest due on Sun River promissory notes that Cicerone owned in exchange for 312,363 new shares of Sun River common stock.

On January 14, 2011 McMillan and Doak signed an option to purchase agreement that gave McMillan the right to purchase NME from Doak for $1,000.  At the time, NME's sole asset was a portfolio of 2,851,666 shares of Sun River stock.  McMillan exercised this option, and he and Doak signed a purchase agreement (the "Doak Agreement") on February 8, 2011, in which Doak transferred NME to McMillan.[3]

---

[3]Cicerone's option agreement with NME gave Cicerone the right to buy NME's Sun River shares, but not NME as an entity.  When McMillan signed the option and Doak

- 3 -

Throughout January and February of 2011, Cicerone made a number of open-market sales of Sun River common stock.  On March 7, 2011 Cicerone exercised the stock warrants it had received from Sun River over the past year to purchase shares of Sun River common stock.  Cicerone elected to exercise 360,000 of these warrants on a cashless basis, whereby Cicerone paid the exercise price of the warrants by permitting Sun River to retain a portion of the shares issuable upon exercise.

On April 1, 2011 Cicerone and McMillan entered into an agreement with Joshua Pingel ("Pingel") under which Pingel agreed to transfer to McMillan all of Pingel's interest in Cicerone in exchange for 350,000 shares of Sun River common stock, $50,000 in cash, and a truck.

In July 2011 McMillan signed an agreement ("Silver Creek Agreement") with Silver Creek Holdings ("Silver Creek"), a Texas trust, in which McMillan agreed to sell NME to Silver Creek for $2,851,666.00.[4]  At the time, NME's only asset was its portfolio of Sun River stock.  The Silver Creek Agreement provided that, if closing did not "take[] place on or before June 30, 2011, either party [could] terminate this Agreement."  P. Nov. 23, 2013 App. 143.[5]  The Silver Creek Agreement also provided that the parties would amend the option agreement that Cicerone had previously signed with Doak.  Pursuant to this term,

_____

Agreement, he purchased NME itself, along with its Sun River shares.

[4]The Silver Creek Agreement is dated June 30, 2011.  The parties agree that the parties did not sign the agreement until July 1, 2011.

[5]For clarity, the court will refer to the appendix by the date filed.

- 4 -

Cicerone and Silver Creek executed an option agreement on July 11, 2011 that gave Cicerone the right to buy 2,851,666 shares of Sun River stock from NME for $3.00 per share on or before December 27, 2011. McMillan and Silver Creek did not exchange the closing documents specified in the Silver Creek Agreement until July 15, 2011.

On February 10, 2012 Sun River initiated an adversary proceeding in the bankruptcy court against McMillan, Cicerone, and the Trust. Sun River chose to assert its claims in the bankruptcy court because a purported creditor of McMillan had filed an involuntary bankruptcy petition against him. The bankruptcy court dismissed the involuntary petition against McMillan and dismissed Sun River's adversary complaint. Sun River moved unsuccessfully for the bankruptcy court to reconsider the dismissal of the adversary complaint. On June 26, 2011—22 days after the bankruptcy court finally dismissed the adversary proceeding—Sun River filed this lawsuit in this court.

Sun River and defendants cross-move for summary judgment, and defendants move to amend the scheduling order and for leave to file an amended answer.

## II

The court will first decide defendants' motion to amend the scheduling order and for leave to file an amended answer because the disposition of this motion impacts the court's resolution of the parties' summary judgment motions.

## A

Defendants maintain in response to Sun River's summary judgment motion and in support of their own motion that statutory or regulatory provisions exempt them from

liability under § 16(b) for a number of the transactions at issue. Sun River contends that defendants have waived these arguments because they are affirmative defenses that defendants did not plead in their answer to Sun River's complaint, as Fed. R. Civ. P. 8 requires. Sun River posits that defendants cannot now amend their answer because the time provided in the court's scheduling order for seeking leave to amend pleadings has expired. Defendants respond that these exemptions are not affirmative defenses. Alternatively, they move to amend the scheduling order and for leave to amend their answer.

B

The court must initially decide whether the statutory exemptions on which defendants rely are affirmative defenses that they were obligated to plead.

Defendants cite the following statutory and regulatory provisions to defeat Sun River's § 16(b) claims: (1) the exemption under SEC Rule 16a-13 for a transaction that is a mere change in the form of beneficial ownership, 17 C.F.R. § 240.16a–13; (2) the exemption for the disposition or closing of a long derivative security position, provided in SEC Rule 16b-6, 17 C.F.R. § 240.16b-6(b); and (3) the exemption for securities acquired in good faith in connection with a debt previously contracted, found in § 16(b), 15 U.S.C. § 78p(b). Under Rule 8(c)(1), a party must affirmatively state any avoidance or affirmative defense, or it waives the defense. *See Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999) (citing *Trinity Carton Co. v. Falstaff Brewing Corp.*, 767 F.2d 184, 194 (5th Cir. 1985)). Rule 8(c)(1) identifies certain affirmative defenses, but it makes clear that the list is not exhaustive. *See* Rule 8(c)(1) ("[A] party must affirmatively state any avoidance or

- 6 -

affirmative defense, *including* . . .") (emphasis added).

Among the affirmative defenses that are not included in Rule 8(c)(1), but that must be pleaded, are statutory and regulatory exemptions. *See, e.g., Ingraham v. United States*, 808 F.2d 1075, 1078 (5th Cir. 1987) (listing "statutory exemption" among the additional defenses that must be timely and affirmatively pleaded under Rule 8); *Suiter v. Mitchell Motor Coach Sales, Inc.*, 151 F.3d 1275, 1279 (10th Cir. 1998) (holding that "[a] claim of exemption is an affirmative defense, which must be specifically pleaded."). Additionally, courts "have generally treated statutory exemptions from remedial statutes as affirmative defenses." *Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1013 (11th Cir. 1982) (collecting cases); *see Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 467 (5th Cir. 2001) (holding that defendants waived defense of "personal staff" exception to anti-discrimination statute by failing to plead the defense). Section 16(b) is a remedial statute. *See Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 434 (1972) (acknowledging the "broadly remedial statutory purpose of § 16(b)[.]"). A number of courts have characterized the statutory exemptions provided in the regulatory scheme that surrounds § 16(b) as affirmative defenses that must be affirmatively pleaded. *See, e.g., Magida v. Cont'l Can Co.*, 231 F.2d 843, 846-47 (2d Cir. 1956) (characterizing exemption under 17 C.F.R. § 240.16a-4 as one of three affirmative defenses pleaded by defendant); *Roth v. Reyes*, 2007 WL 2470122, at *6, n.1 (N.D. Cal. Aug. 27, 2007) (acknowledging that exemption to § 16(b) contained in 17 C.F.R. § 240.16b-3 is affirmative defense); *Rosen v. Brookhaven Capital Mgmt. Co.*, 194 F.Supp.2d 224, 228 (S.D.N.Y. 2002) (recognizing exemption provided by 17 C.F.R.

- 7 -

§ 240.16a-1 to be affirmative defense); *cf. Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 45 n.12 (2d Cir. 2012) (declining to decide exemption claim on grounds of waiver due to failure to plead as affirmative defense, and instead dismissing exemption claim on the merits).

The exemptions on which defendants rely do not merely attack or rebut one or more of the prima facie elements of Sun River's claims under § 16(b).  Rather, they assert matters of confession and avoidance: they acknowledge that all of the elements of a § 16(b) claim are met, but they assert exemptions from liability.  Therefore, the court holds that the statutory exemptions to § 16(b) liability on which defendants rely are affirmative defenses that must be pleaded, as Rule 8(c)(1) requires.

C

Defendants request in the alternative that, if the court determines that they are relying on affirmative defenses that must be pleaded, the court amend the scheduling order and grant them leave to amend their answer.

Rule 16(b)(3)(A) provides that the "scheduling order must limit the time to . . . amend the pleadings[.]"  When a motion to amend the pleadings is filed after the court-ordered deadline, the court must first decide whether to modify the scheduling order under the Rule 16(b)(4) good cause standard before considering whether to grant leave to amend under the more liberal standard of Rule 15(a)(2).  *See S&W Enters., L.L.C. v. SouthTrust Bank of Ala., N.A.*, 315 F.3d 533, 536 (5th Cir. 2003); *Am. Tourmaline Fields v. Int'l Paper Co.*, 1998 WL 874825, at * 1 (N.D. Tex. Dec. 7, 1998) (Fitzwater, J.).

- 8 -

On August 28, 2013 the court entered the scheduling order in this case, setting September 13, 2013 as the deadline for a party to move for leave to amend the pleadings and January 31, 2014 as the deadline for the parties to complete discovery. Defendants filed the instant motion for leave to amend their answer on April 2, 2014. Because the motion was filed over six months after the deadline for moving for leave to amend the pleadings, defendants must first establish good cause under Rule 16(b)(4) to modify the scheduling order.

The court assesses four factors when deciding whether to grant a motion for leave to modify under Rule 16(b)(4): "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters.*, 315 F.3d at 536 (citation, internal quotation marks, and brackets omitted). The court considers the four factors holistically and "does not mechanically count the number of factors that favor each side." *EEOC v. Serv. Temps, Inc.*, 2009 WL 3294863, at *3 (N.D. Tex. Oct. 13, 2009) (Fitzwater, C.J.), *aff'd*, 679 F.3d 323 (5th Cir. 2012).

D

1

The court first considers defendants' explanation for failing to move by the court-ordered deadline for leave to amend their answer. Defendants offer as an explanation only that "they did not believe that what they raised were, in fact, affirmative defenses." Ds. Br. in Support of Mot. for Leave 3. Their misunderstanding of the law, however, constitutes

mere inadvertence, which is "tantamount to no explanation at all[.]" *S&W Enters.*, 315 F.3d at 536.  As the court explains above, a number of courts have held that statutory exemptions to § 16(b) liability are affirmative defenses.  Defendants' explanation for not timely moving for leave to amend constitutes inadvertence or mistake, neither of which is a compelling reason to modify the scheduling order.  This factor weighs against granting defendants' motion.

2

Under the second factor, the court considers the importance of the amendment.  The court concludes that amending the answer to include these affirmative defenses is important because these defenses appear to be the only grounds for defending a number of Sun River's § 16(b) claims.  *See* Ds. Br. in Support of Mot. for Leave 5 (asserting that "more than $14,500,000 of the alleged damages hinge on what Sun River asserts are affirmative defenses").  Therefore, this factor weighs in favor of granting defendants' motion for leave.

3

Under the third factor, the court considers the potential for prejudice to Sun River if the court modifies the scheduling order, thereby enabling defendants to amend their answer.  As just noted, these affirmative defenses appear to be the only grounds for defending a number of Sun River's claims.  Although in the context of the second factor this weighs in favor of modifying the scheduling order, when considering the third factor, it weighs against doing so.  On the eve of trial, it is prejudicial to modify the scheduling order and then permit defendants to amend their answer to include previously unpleaded affirmative defenses that

- 10 -

could defeat Sun River's claims.  This case is set for trial on the two-week docket of November 22, 2014, and the discovery deadline expired January 31, 2013.  Were the court to modify the scheduling order and then permit defendants to amend their answer, Sun River would either be required to commence trial in fewer than three months on affirmative defenses that have not been pleaded and on which Sun River has conducted no discovery, or to request a trial continuance.  And although defendants argue that Sun River was made aware of their intent to rely on these affirmative defenses in the bankruptcy court adversary proceeding, this does not excuse defendants' failure to seek leave to amend their answer until this late stage of the lawsuit.

4

Under the fourth factor, the court considers the availability of a continuance to cure prejudice.  To address the prejudice that Sun River would incur by permitting defendants to amend their answer, it would be necessary to continue both the discovery deadline and the trial.  Such continuances would prejudice Sun River, who is the plaintiff seeking its day in court.

5

Assessing the four factors holistically, the court finds that defendants have not shown good cause to modify the scheduling order.  Accordingly, the court denies their motion to amend the scheduling order and for leave to file an amended answer.

III

The court now turns to the parties' cross-motions for summary judgment. Because Sun River will have the burden of proof at trial on its claims against defendants, to obtain summary judgment on these claims, it "must establish 'beyond peradventure all of the essential elements of the claim[s].'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). This means that Sun River must demonstrate that there are no genuine and material fact disputes and that it is entitled to summary judgment as a matter of law. *See, e.g., Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

Defendants move for summary judgment on many of Sun River's claims. Because Sun River will bear the burden of proof at trial on its claims, defendants can meet their summary judgment obligation by pointing the court to the absence of admissible evidence to support Sun River's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once defendants do so, Sun River must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is

such that a reasonable jury could return a verdict in Sun River's favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Sun River's failure to produce proof as to any essential element of a claim renders all other facts immaterial.  *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).

Defendants also move for summary judgment on their affirmative defenses of limitations and offset.  These are affirmative defenses for which defendants will bear the burden of proof at trial.  "To be entitled to summary judgment on an affirmative defense for which [they] will have the burden of proof, [defendants] must establish beyond peradventure all of the essential elements of the defense."  *Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 807 (Fitzwater, C.J.) (brackets added; citations, ellipsis, and internal quotation marks omitted).[6]

IV

Sun River moves for summary judgment on the preliminary issue of whether McMillan and Cicerone beneficially owned more than 10% of the outstanding shares of Sun River common stock, so as to bring them within the purview of § 16(b) of the Exchange Act.

A

> The general purpose of Congress in enacting § 16(b) is well known.  Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public.  By trading on this information, these persons could reap profits at the expense of less well informed

---

[6]Because defendants have waived unpleaded affirmative defenses, the court denies defendants' motion for summary judgment to the extent it is based on these defenses.

> investors.  In § 16(b) Congress sought to curb the evils of insider
> trading by taking the profits out of a class of transactions in
> which the possibility of abuse was believed to be intolerably
> great.  It accomplished this by defining directors, officers, and
> beneficial owners as those presumed to have access to inside
> information and enacting a flat rule that a corporation could
> recover the profits these insiders made on a pair of security
> transactions within six months.

*Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243 (1976) (footnotes,

citations, ellipsis, and one parenthetical omitted).[7] To establish that the defendant in question

is liable under § 16(b), Sun River must prove that there was (1) a purchase and (2) a sale of

securities (3) by a beneficial owner, director, or officer of the issuer (4) within a six-month

period.  *See Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).

> The statute requires disgorgement to the company of any profit
> derived from the matching of any purchase and any sale of an
> "equity security" . . . within a six-month period by a statutory
> insider, irrespective of intent or whether overall trading during
> that six months (i.e., all sales and purchases combined) resulted

---

[7]Section 16(b) provides:

> For the purpose of preventing the unfair use of information
> which may have been obtained by such beneficial owner,
> director, or officer by reason of his relationship to the issuer, any
> profit realized by him from any purchase and sale, or any sale
> and purchase, of any equity security of such issuer . . . within
> any period of less than six months . . . shall inure to and be
> recoverable by the issuer, irrespective of any intention on the
> part of such beneficial owner, director, or officer in entering into
> such transaction of holding the security . . . purchased or of not
> repurchasing the security . . . sold for a period exceeding six
> months.

15 U.S.C. § 78p(b).

in a loss.

*Id.*

Sun River alleges that McMillan and Cicerone were beneficial owners of Sun River stock.  Only beneficial owners of "more than 10 percent of any class of any equity security . . . which is registered pursuant to section 78*l*" qualify as "beneficial owners" for purposes of § 16(b).  15 U.S.C. § 78p(a).  The term "beneficial owner" is not defined in the Exchange Act, but it is defined in SEC regulations.  For purposes of determining whether a person is a beneficial owner of more than 10% of any class of equity securities, SEC regulations define "beneficial owner" as

> any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a); *see Huppe v. WPCS Int'l, Inc.*, 670 F.3d 214, 220-21 (2d Cir. 2012) (citing 17 C.F.R. § 240.16a-1(a)(1)–(2); *id.* § 240.13d-3(a)(1)-(2)) (holding that "for the purposes of Section 16(b) disgorgement liability, a 'beneficial owner' is any 'person' who, directly or indirectly, has or shares (1) voting or investment power over and (2) a pecuniary interest in a security").

## B

To support its contention that Cicerone is a beneficial owner, Sun River cites Cicerone's filing statement with the SEC made in compliance with § 13(d) of the Exchange

Act.  In that filing, Cicerone disclosed owning 7,343,356 shares of Sun River common stock, or 30.85% of shares outstanding, as of August 3, 2010.  Cicerone described itself as a 10% owner of Sun River common stock in all of its § 16(a) filings with the SEC until February 2012.  Defendants do not appear to dispute Cicerone's status as a beneficial owner of Sun River from August 3, 2010 through February 2012.

With respect to McMillan, Sun River points out that McMillan's status as a 10% beneficial owner of Sun River flows directly from Cicerone's status as a 10% owner.  From April 1, 2011 to May 2, 2011, McMillan was the sole owner of Cicerone.  And from May 2, 2011 through at least the end of 2011, Cicerone was wholly owned by the Trust, of which McMillan was the sole trustee.  Throughout the time McMillan owned Cicerone directly, or beneficially through the Trust, he exercised complete control over Cicerone and its assets. This evidence is sufficient to meet the regulatory requirement that a beneficial owner "directly or indirectly" exercise or share voting power or investment power over the securities.  And defendants do not appear to dispute McMillan's status as a beneficial owner.

The court therefore holds that Sun River has established beyond peradventure that Cicerone and McMillan beneficially owned more than 10% of the outstanding shares of Sun River common stock at all relevant times and were thus insiders subject to § 16(b).

V

Defendants and Sun River move for summary judgment on the issue of whether § 16(b)'s two-year statute of limitations[8] bars Sun River's claims against Cicerone and the Trust[9] for any alleged profit realized more than two years prior to June 26, 2013.

A

Defendants have established, and Sun River does not dispute, that defendants realized some of their profits more than two years before Sun River filed this lawsuit on June 26, 2013, and that, absent tolling, Sun River's claim for any profits realized before June 26, 2011 would be barred by limitations.  Sun River maintains that the statute of limitations does not bar any of its claims, however, because the limitations period was tolled on various grounds.

Although defendants have the burden of establishing the affirmative defense of limitations, Sun River has the burden of proving equitable or legal tolling of the limitations period.  *See, e.g., McIver v. Am. Eagle Airlines, Inc.*, 413 Fed. Appx. 772, 776-77 (5th Cir. 2011) (per curiam) (noting that once defendant establishes that charge was not filed within limitations period, burden shifts to plaintiff to show that limitations period was subject to tolling.  Sun River relies on three grounds to establish that its claims against Cicerone and the Trust are not time-barred: (1) under 11 U.S.C. § 108(c), the limitations period was

_____

[8]*See* 15 U.S.C. § 78p(b) (prescribing two-year statute of limitations from time profit was earned on forbidden trades).

[9]Defendants do not challenge Sun River's claims against McMillan based on limitations.

- 17 -

extended for 30 days after the dismissal of the bankruptcy court adversary proceeding; (2) ordinary legal tolling principles under Fed. R. Civ. P. 3 ("Rule 3") tolled the statute of limitations while Sun River's complaint was pending in the bankruptcy court; and (3) equitable tolling principles tolled the statute of limitations because Sun River exercised due diligence in pursuing its judicial remedies.

B

11 U.S.C. § 108(c), a provision of the Bankruptcy Code, does not support Sun River's contention that the limitations period was tolled with respect to its claims against Cicerone and the Trust.  Section 108(c) provides:

> Except as provided in section 524 of this title, if applicable nonbankruptcy law . . . fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the *debtor* . . . and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) 30 days after notice of the termination . . . of the stay[.]

11 U.S.C. § 108(c) (emphasis added).  Section 108(c) is plainly inapplicable to Sun River's claims against Cicerone or the Trust because neither was a debtor in the bankruptcy proceeding.[10]  Accordingly, the limitations period was not tolled under § 108(c).

---

[10]It *does* apply to Sun River's claims against McMillan, who was a debtor in the bankruptcy proceeding.

C

Sun River maintains that legal tolling principles derived from Rule 3 operated to toll the limitations period as to Cicerone and the Trust while the adversary proceeding was pending.  Rule 3 provides that "[a] civil action is commenced by filing a complaint with the court."  *See also* Fed. R. Bankr. P. 7003 (applying Rule 3 in bankruptcy court adversary proceedings).  "In federal cases, filing a complaint with the court commences an action and tolls the applicable statute of limitations." *Martin v. Demma*, 831 F.2d 69, 71 (5th Cir. 1987) (per curiam) (citing *West v. Conrail*, 481 U.S. 35, 39 (1987)).  But Sun River has not cited any authority, and the court has found none, to support the proposition that Rule 3 operates to automatically toll limitations during the pendency of a bankruptcy proceeding that is later dismissed without prejudice and refiled in federal district court.

Where *legal* principles fail to toll a limitations period, *equitable* principles may apply.

> [S]tatutory limitation periods are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.  The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (quoting *Order of R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348-49 (1944)) (internal quotation marks omitted).

> Nevertheless, the mere fact that a federal statute providing for substantive relief also sets a time limitation upon the institution of suit under the statute does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose.

*Platoro Ltd. v. Unidentified Remains of a Vessel*, 614 F.2d 1051, 1054 (5th Cir. 1980); *see also Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 428 (1965) (noting that policy of repose underlying statutes of limitations "is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights"); *Young v. United States*, 535 U.S. 43, 49 (2002) ("[L]imitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute[.]") (internal quotation marks and citations omitted).

The Supreme Court identified one such circumstance in *Burnett*, in which it held:

> when a plaintiff begins a timely [Federal Employers' Liability Act ("FELA")] action in a state court of competent jurisdiction, service of process is made upon the opposing party, and the state court action is later dismissed because of improper venue, the FELA limitation is tolled during the pendency of the state action.

*Burnett*, 380 U.S. at 428.  In doing so, the Court noted the remedial nature of FELA, the fact that plaintiff had "brought an action within the statutory period in the state court of competent jurisdiction[,]" and that although the plaintiff was mistaken as to venue, the mistake was reasonable.  *Id.* at 429.

In *Platoro* the Fifth Circuit considered whether the statute of limitations in an

admiralty proceeding was tolled during the pendency of the initial suit, when that suit was dismissed because the district court did not have *in rem* jurisdiction over the property in question, and the suit was refiled in the proper district court several days after dismissal. *Platoro*, 614 F.2d at 1052-53. The court concluded the limitations period should be tolled, pointing to the plaintiff's diligence in prosecuting the suit, and to the fact that the defendant was "cognizant of [plaintiff's] claim from almost the beginning." *Id.* at 1054-55.

Here, Sun River filed an adversary proceeding in bankruptcy court on February 10, 2012, against McMillan, the Trust, and Cicerone, alleging the same violations of § 16(b) as it asserts in this lawsuit. All parties consented to have the adversary proceeding heard by the bankruptcy court. When the bankruptcy court dismissed the adversary proceeding without prejudice and without addressing the merits, Sun River asked the bankruptcy court to retain jurisdiction over the adversary proceeding. When the bankruptcy court declined to do so, Sun River filed the instant lawsuit.

Based on the remedial nature of § 16(b) of the Exchange Act and the fact that Sun River initially filed suit in a court of competent jurisdiction, the court holds that a reasonable trier of fact could find that the limitations period was tolled during the pendency of the adversary proceeding.[11]  Accordingly, defendants are not entitled to summary judgment

---

[11]Defendants argue that the limitations period should not be tolled during the pendency of the adversary proceeding, citing cases that have been involuntarily dismissed without prejudice, and with no credit or tolling given for the time elapsed while the lawsuit was pending. But the cited cases all involved dismissals where the plaintiff failed to comply with a procedural requirement or was dilatory in prosecuting the suit. *See, e.g., Hawkins v. McHugh*, 46 F.3d 10, 12 (5th Cir. 1995) (holding that involuntary dismissal of suit without

based on limitations.

But for its part, Sun River is not entitled to summary judgment dismissing defendants' limitations defense because it must establish beyond peradventure that the limitations period was equitably tolled. "[T]he 'beyond peradventure' standard is 'heavy.'" *Sowell*, 603 F.Supp.2d at 923-24. And although a reasonable jury could certainly find that Sun River acted reasonably in prosecuting its suit and that the limitations period was equitably tolled as a result, Sun River has failed make this showing beyond peradventure. Because this genuine fact issue remains, the court holds that defendants' affirmative defense of limitations remains for trial.

## VI

Sun River and defendants both move for summary judgment as to Sun River's claim that the "2nd Amendment of NME Option" by Cicerone that occurred on June 27, 2011 constitutes a sale and purchase that is actionable under § 16(b). Nowhere in Sun River's complaint does it mention this particular transaction or amendment. In fact, Sun River's motion for summary judgment is the first time Sun River mentions this particular transaction as a basis for recovering under § 16(b). "As a general rule, new claims cannot be raised in motions for summary judgment." *Buchanan v. McCool*, 2006 WL 3044446, at *12 (E.D.

---

prejudice for lack of service on defendant within 120 days did not toll limitations period); *Gerhardson v. Gopher News Co.*, 698 F.3d 1052, 1056 (8th Cir. 2012) (holding that plaintiff's failed motion to intervene in prior action against defendant did not toll limitations period for plaintiff's present action against defendant); *Hilbun v. Goldberg*, 823 F.2d 881, 883 (5th Cir. 1987) (holding that interruption in prescription caused by filing of prior action was erased when action was dismissed for plaintiff's failure to prosecute).

Tex. Oct. 25, 2006) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004)); *see also Orthoflex, Inc. v. ThermoTek, Inc.*, 983 F. Supp.2d 866, 873 (N.D. Tex. Oct. 31, 2013) (Fitzwater, C.J.) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." (quoting *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (internal quotation marks omitted))).

Because Sun River failed to raise this ground of recovery in its complaint or in an amended complaint, it is not properly before the court and will not be considered.

VII

Sun River and defendants move for summary judgment regarding Sun River's claim that the "1st Amendment of NME Option" by Cicerone that occurred on September 21, 2010 constituted a simultaneous sale and purchase, as contemplated by § 16(b).

A

The facts surrounding the first amendment of the NME option are undisputed. On August 4, 2010 Cicerone entered into a stock option agreement with NME, under which Cicerone acquired a call option to purchase 2,941,666 shares of Sun River common stock at a fixed price of $1.50 per share.[12] Defendants do not dispute that the initial acquisition of the call option by Cicerone constituted a purchase for purposes of § 16(b). But on September

---

[12]Sun River alleges in its motion for summary judgment that this call option was acquired on August 3, 2010, but the option that Sun River cites in the appendix to its motion states that the date is August 4, 2010. The difference between August 3 and August 4 is immaterial to the court's analysis.

21, 2010, the option was amended by (1) extending the expiration date of the option from August 4, 2012 to September 21, 2012; and (2) changing the exercise price from $1.50 per share to $1.00 per share for the first 1,000,000 shares, $2.00 per share for the second 1,000,000 shares, and $1.50 per share for the remaining 941,666 shares.

B

To obtain summary judgment on this claim, Sun River must establish beyond peradventure that the amendment of the NME Option constituted (1) a purchase and (2) a sale of securities (3) by a beneficial owner, director, or officer of the issuer (4) within a six-month period.  An insider's transactions in derivative securities may constitute a purchase or sale actionable under § 16(b) and can be matched with another to create liability under the short-swing profit rule.  *See* 17 C.F.R. § 240.16a-1(c); Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Release No. 34-28869, 1991 WL 292000, *15 (Feb. 8, 1991) ("[A]cquisitions of call options from an issuer or third party are deemed purchases for purposes of Section 16 and are matchable with sales of the underlying stock or sales of another call equivalent derivative security[.]").  "For § 16(b) purposes, acquiring a derivative security that gives the holder the option to purchase shares at a fixed price or to convert into shares at a fixed price is treated as equivalent to purchasing the shares directly." *Analytical Surveys*, 684 F.3d at 48.  A reasonable trier of fact could only find that Cicerone's initial acquisition of the option to purchase shares at a fixed price was a purchase under § 16(b), as was Cicerone's acquisition of the amended option to purchase

- 24 -

shares at a fixed price. Defendants do not dispute that each of these transactions constituted

a purchase for purposes of § 16(b). But Sun River argues that, not only did the amendment

constitute a purchase, it was also a simultaneous sale of the original option back to Cicerone

that is a matchable transaction giving rise to liability under § 16(b). This is the only disputed

element with respect to this transaction.

The Exchange Act broadly defines sale as "any contract to sell or otherwise dispose

of." 15 U.S.C. § 78c(a)(14). Under § 16(b), a "sale" can include a variety of different

arrangements that would not satisfy the "terms of [the] commercial law of sales and notions

of contractual rights and duties." *Bershad v. McDonough*, 428 F.2d 693, 697 (7th Cir. 1970).

Rather than look to a technical definition of the term "sale," as used in other contexts, the

court must interpret § 16(b) "so that the remedial purposes of the section and rule will be

effectuated." *Sw. Realty, Ltd. v. Daseke*, 1990 WL 85921, at *6 (N.D. Tex. May 9, 1990)

(Fitzwater, J.) (interpreting term "sale" under § 10(b)).[13] The purpose of § 16(b) is to

"prevent[] the unfair use of information which may have been obtained by [a] beneficial

owner, director, or officer by reason of his relationship to the issuer[.]" *Tex. Int'l Airlines*

*v. Nat'l Airlines, Inc.*, 714 F.2d 533, 539 (5th Cir. 1983) (alteration in original) (quoting *Tyco*

---

[13]*See also Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 124 (2d Cir. 2002) (quoting *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir. 1969)) ("Where, as here, the transaction at issue does not plainly fall within the literal terms of the statute, '[t]he judicial tendency, especially in this circuit, has been to interpret Section 16(b) in ways that are most consistent with the legislative purpose.'") (alteration in original)); *Champion Home Builders Co. v. Jeffress*, 490 F.2d 611, 615 (6th Cir. 1974) (stating that the statute is construed "in terms of federal securities law, and the analysis must focus on and be consistent with the congressional mandate of curbing insider short-swing speculation").

*Labs., Inc. v. Cutler-Hammer, Inc.*, 490 F. Supp. 1, 5 (S.D.N.Y. 1980)).

Defendants and Sun River agree that the amendment of the NME option to change the purchase price and extend the exercise deadline was a material amendment. The SEC Rules state that a material amendment to a derivative security is "deemed to be a redemption of [the] old security and grant of a new security for purposes of Section 16." *Analytical Surveys*, 684 F.3d at 47 n.17 (quoting Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 29,131, 1991 WL 292345, at *4 n.35 (April 26, 1991)). A redemption of the old security, or derivative security as the case is here, is a "disposition." Accordingly, a reasonable trier of fact could only find that the amendment of the option qualifies as a contract to dispose of a derivative security and constitutes a sale for purposes of § 16(b).[14]

The court therefore holds that the 1st Amendment of the NME option constitutes a simultaneous purchase and sale for purposes of § 16(b), and it grants Sun River's motion for summary judgment and denies defendants' motion in this respect.

---

[14]SEC Rule 16b-6(d) provides an exemption for this situation. A deemed redemption operates like a cancellation or expiration of the option, and, under SEC Rule 16b-6(d), "[t]he disposition or closing of a long derivative security position, as a result of cancellation or expiration, shall be exempt from section 16(b) of the [Exchange] Act where no value is received from the cancellation or expiration." 17 C.F.R. § 240.16b-6(d). But as noted above, defendants have failed to plead the affirmative defense under Rule 16b-6(d) and have thus waived it.

VIII

Sun River and defendants move for summary judgment regarding Sun River's claim that Cicerone's receipt of 312,363 shares in exchange for canceling Sun River's debt was a "purchase" for purposes of § 16(b). Defendants do not dispute the elements of a § 16(b) claim: that Cicerone and McMillan were beneficial owners of the 312,363 shares of stock or that it was a purchase under the Exchange Act's definition of purchase. Rather, defendants contend that this transaction is exempt because it falls under the "debt exception" found in § 16(b). As discussed previously, defendants waived this defense by failing to plead it in their answer, so the court will not consider it. Because it is undisputed that the elements of § 16(b) with respect to this transaction are met, the court grants Sun River's motion for summary judgment and denies defendants' motion concerning this transaction.

IX

Sun River and defendants move for summary judgment on the issue of whether Cicerone's transfer of 350,000 shares of stock to Pingel in exchange for his ownership interest in Cicerone was a sale for purposes of § 16(b). Defendants maintain that this transaction is excluded from § 16(b) coverage under the exemption in SEC Rule 16a-13 for mere changes in beneficial ownership. The court holds that defendants waived this defense by failing to plead it.

Alternatively, defendants posit that this transaction does not constitute a sale for purposes of § 16(b). They maintain that, because this transaction is not a straightforward

sale, the court must examine whether characterizing the transaction as a sale will fulfill the purposes of the statute.

The court holds that a reasonable trier of fact could only find that this transaction falls squarely within the Exchange Act's definition of a "sale."  *See* 15 U.S.C. § 78c(a)(14) (defining "sale" as "any contract to sell or otherwise dispose of.").  Defendants acknowledge that, on April 1, 2011, Pingel, McMillan, and Cicerone entered into a contract to part ways, under which Pingel received from Cicerone $50,000 in cash, a truck, and 350,000 shares of Sun River common stock.  Regardless whether the transaction involved a change in beneficial ownership, a reasonable trier of fact could only find that it was a contract to dispose of securities, meeting the broad definition of "sale" in § 78c(a)(14).[15]  Because a reasonable trier of fact could only find that this transaction was a "sale," and the remaining elements of a § 16(b) claim are undisputed, the court grants Sun River's motion for summary judgment and denies defendants' motion as to this transaction.

## X

Sun River moves for summary judgment on its claim that Cicerone purchased 100,000 shares of Sun River Stock when it received these shares in exchange for providing consulting services to Sun River between August 2010 and January 2011.  Because defendants do not dispute the validity of this claim, the court grants Sun River's motion for summary judgment

---

[15]The fact that an SEC Rule provides an exemption from § 16(b) for this precise scenario indicates that, but for the exemption, this transaction would fall within the purview of § 16(b).

on this issue.[16]

## XI

Sun River and defendants move for summary judgment on Sun River's claim that defendants engaged in short-swing purchases and sales of stock warrants that subject them to liability under § 16(b).  Defendants do not dispute that Cicerone's receipt of 120,000 stock warrants in exchange for consulting services during the period between September 2010 and February 2011 were purchases under § 16(b).  Defendants do challenge, however, whether Cicerone's cashless exercise of the warrants on March 7, 2011 was a deemed sale for purposes of § 16(b).

Typically, the exercise of a derivative security, like a stock warrant, to obtain the underlying security is exempt from § 16(b) under SEC Rule 16b-6(b).  *See* 17 C.F.R. § 240.16b-6(b).  But as discussed above, the exemption provided by Rule 16b-6(b) is an affirmative defense that defendants have waived by failing to plead it.  Thus the court will not consider whether the SEC Rule 16b-6(b) exemption is available; instead, it will address whether the exercise of a stock warrant meets the Exchange Act's definition of "sale" as "any contract to sell or otherwise dispose of."  15 U.S.C. § 78c(a)(14).  The court concludes that it does.

An exercise of a warrant is a contract to dispose of the warrant itself in exchange for the underlying security, and therefore meets § 78(c)(a)(14)'s definition of "sale."  Defendants

---

[16]The court is not granting a "default" summary judgment in this respect.  *See infra* note 17.

do not refute this conclusion; they rely instead on an affirmative defense that they have waived. The court therefore grants Sun River's motion for summary judgment and holds that defendants' acquisition of stock warrants and subsequent cashless exercise of the warrants are matchable purchases and sales under § 16(b).

XII

Sun River and defendants move for summary judgment on the question whether McMillan's purchase and sale of NME to Silver Creek violated § 16(b).

A

The court first considers whether Sun River has established beyond peradventure the first three elements of its claim. To prevail on this claim, Sun River must prove that McMillan (1) purchased an equity security, (2) sold the same, (3) while an insider or beneficial owner, (4) within a six-month period.

McMillan admits that he purchased and sold NME. And, as discussed above, Sun River has established beyond peradventure that McMillan was a beneficial owner of Sun River during the relevant time. McMillan admits that NME's primary asset was its 2,851,666 shares of Sun River common stock, and that "the acquisition of NME may be considered the equivalent of the purchase of the Sun River stock." Ds. Dec. 26, 2013 Br. 23. McMillan neither disputes Sun River's arguments in this regard nor designates any facts that would enable a reasonable trier of fact to find in his favor on this question.[17]  Accordingly, the court

---

[17]McMillan's failure to respond does not, of course, permit the court to enter a default summary judgment. The court is permitted, however, to accept Sun River's evidence as

holds that Sun River has established the first, second, and third elements of its claim beyond peradventure.

B

The court now considers whether the purchase and sale of NME occurred within a six-month period, as § 16(b) requires.  The parties move for summary judgment regarding the date of McMillan's purchase of NME.  Because they do not dispute the relevant facts regarding the purchase, the court will determine the date of purchase as a question of law. *See, e.g., Fed. Ins. Co. v. CompUSA, Inc.*, 239 F.Supp.2d 612, 615 (N.D. Tex. 2002) (Fitzwater, J.), *aff'd*, 319 F.3d 746 (5th Cir. 2003).

McMillan argues that he purchased NME on January 14, 2011, when he and Doak executed an option under which McMillan obtained the right to purchase NME.  Sun River contends that the purchase occurred for § 16(b) purposes on February 8, 2011, the date McMillan exercised the option to purchase NME and the parties signed the purchase agreement.

On January 14, 2011 McMillan and Doak entered into an agreement under which Doak granted McMillan a 30-day option to purchase all of the member interests in NME for $1,000.  The option agreement restricted Doak from transferring or selling his membership interest in NME, and it restricted NME from disposing of any assets during the option period and through closing.  McMillan's acquisition of the option agreement put him in a call

---

undisputed.  *See, e.g., Tutton v. Garland Indep. Sch. Dist.*, 733 F. Supp. 1113, 1117 (N.D. Tex. 1990) (Fitzwater, J.).

equivalent position, because it gave him the right to acquire NME, and thus acquire NME's underlying assets and securities, at a fixed price of $1,000.  *See Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 322 (2d Cir. 1998) (noting that call equivalent position arises when purchaser acquires right to purchase seller's shares at a fixed price).  Under SEC Rule 16b-6(a), "[t]he establishment of . . . a call equivalent position . . . shall be deemed a purchase of the underlying security for purposes of section 16(b)[.]"  17 C.F.R. § 240.16b-6(a).  Because the acquisition of the option to purchase NME on January 14, 2011 was the establishment of a call equivalent position, it was a deemed purchase of NME, and a purchase of the underlying securities held by NME.  The court therefore grants defendants' motion for summary judgment that the purchase of NME occurred on January 14, 2011, and denies Sun River's motion in this respect.

C

Sun River also moves for summary judgment regarding the date of McMillan's sale of NME to Silver Creek.[18]  Sun River contends the sale occurred on the date recited in the sales agreement: June 30, 2011.  McMillan counters that the actual sale date is July 15, 2011, because it was not until that date that he satisfied all conditions for closing and was thus irrevocably committed to sell NME.

---

[18]Defendants do not move for summary judgment on this issue.  They argue instead that there is a dispute of material fact with respect to this transaction.  Defendants do not identify in the briefing the disputed material facts concerning this issue.  The court's reading of the briefing leads it to conclude that the facts concerning this transaction are undisputed, and that the parties dispute the legal significance of the facts rather than the facts themselves.

The question of when a sale is complete for purposes of § 16(b) is governed by federal law and "must be decided so as to foster the goals of [the Exchange Act] rather than under concepts of when title passes under state law." *Provident Sec. Co. v. Foremost-McKesson, Inc.*, 506 F.2d 601, 606 (9th Cir. 1974) (citing *Bershad*, 428 F.2d at 696-97).  To determine when a sale has occurred, "courts have looked to that point at which the insider has relinquished his ability to control the transaction to the extent that he no longer has the potential to use inside information to his own advantage and to the detriment of the public or outside shareholders." *Id.* at 606-07 (citing *Booth v. Varian Assocs.*, 334 F.2d 1 (1st Cir. 1964)).  "This ability to control is generally relinquished when the insider is irrevocably bound to sell a specific number of shares at a fixed price, even though the formalities necessary for the transfer of title may not have yet occurred." *Id.* at 607 (citing *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973)).  Thus the date of the sale of NME to Silver Creek for purposes of § 16(b) is the date McMillan was irrevocably bound to sell NME.

McMillan and Silver Creek entered into the Silver Creek Agreement—which provided for the sale of NME to Silver Creek for $2,851,666.00—on June 30, 2011.  The Silver Creek Agreement required that a number of conditions be met before the transaction could close: McMillan would have to provide, *inter alia*, certain corporate documents and acquire certain releases, resignations, and certificates.  Silver Creek would have to execute a wire transfer for the cash payment, and provide a note, a pledge, and a resolution appointing Casey as the

sole member and manager.  Further, § 3.02 of the Silver Creek Agreement states: "Unless the Closing of this transaction takes place on or before June 30, 2011, either party may terminate this Agreement."  Ps. Nov. 23, 2013 App. 143.  It is undisputed that closing did not take place on or before June 30, 2011.[19]  And because it did not, McMillan and Silver Creek both had the right to back out of the transaction at any time before closing.  Thus McMillan was not "irrevocably bound to sell" NME to Silver Creek until the closing of the transaction took place on July 15, 2011, when McMillan delivered the stock certificates, thus completing the final precondition to closing.  The court therefore concludes that a reasonable trier of fact could only find that the sale of NME occurred on July 15, 2011.

To meet its summary judgment burden, Sun River was required to establish beyond peradventure that the purchase and sale of NME by McMillan occurred within a six-month period.  Because the court holds that the purchase of NME occurred on January 14, 2011, and a reasonable trier of fact could only find the sale of NME occurred on July 15, 2011, Sun River has failed to meet this burden.  The court therefore denies Sun River's motion for summary judgment in this respect.

Defendants have failed to move for summary judgment on this issue, but the court raises it *sua sponte* that defendants are entitled to summary judgment dismissing Sun River's § 16(b) claim based on McMillan's purchase and sale of NME to Silver Creek.  The court can grant summary judgment *sua sponte* if it gives the adverse party proper notice and an

---

[19]In fact, Silver Creek did not even sign the contract until July 1, 2011.

opportunity to file an opposition response. *See, e.g., Mo. Pac. R.R. Co. v. Harbison–Fischer Mfg. Co.*, 26 F.3d 531, 539 (5th Cir. 1994); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.*, 932 F.2d 442, 445 (5th Cir. 1991).  If Sun River desires to oppose summary judgment on this basis, it must file a supplemental brief and supporting appendix within 21 days of the date this memorandum opinion and order is filed.  If it does not, the court will grant summary judgment in favor of defendants as to this ground of Sun River's § 16(b) claim.  If it does, the court will decide whether to request briefing from defendants before deciding this question.

## XIII

The Trust moves for summary judgment on its affirmative defense of offset.  Without suggesting that the court agrees with Sun River that granting summary judgment on this affirmative defense would be unconstitutional, the court concludes that it need not now decide the damages offset issue, when the Trust may not be found liable and has brought no counterclaim on the note in question.  The court therefore declines to address this issue. Should it become necessary to do so later, the court will decide whether additional briefing or argument is necessary.

\*   \*   \*

For the reasons explained, the court denies defendants' motion to amend the scheduling order and for leave to file an amended answer, and it grants in part and denies in

part the parties' motions for summary judgment.

**SO ORDERED.**

September 25, 2014.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE